IN THE MATTER OF J.O.
2024 OK 82
Case Number: 121610
Decided: 12/10/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2024 OK 82, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

IN THE MATTER OF: J.O., Deprived Child.

ALBERT PARKER, Natural Father, Petitioner/Appellant,
v.
STATE OF OKLAHOMA, Respondent/Appellee.
and
IN THE MATTER OF: J.O., Deprived Child.

STATE OF OKLAHOMA, Petitioner/Appellant.
v.
ALBERT PARKER, Respondent/Appellee.

OPINION

The State of Oklahoma moved to terminate Father's (Parker) parental rights. The motion was granted by the trial court. COCA reversed the trial court and remanded the case for a new trial. Both Parker and the State petitioned for certiorari review, and both petitions were granted. We find that (1) Parker's due process rights were violated; and (2) the State must comply with ICWA requirements in the parental termination proceedings. The Opinion of the Court of Civil Appeals is vacated and the case remanded to the trial court for further proceedings.

CERTIORARI PREVIOUSLY GRANTED;
COURT OF CIVIL APPEALS OPINION VACATED;
TRIAL COURT REVERSED;
CASE REMANDED TO TRIAL COURT

Greg Lavender, Law Office of Greg Lavender, Tulsa, Oklahoma for Parker;

Jeff Neise, Assistant District Attorney, Tulsa, Oklahoma, for State of Oklahoma;

Lizzie Riter, Lizzie Riter Law, Coweta, Oklahoma for J.O.

KUEHN, J.:

¶1 The State moved to terminate Father's (Parker) parental rights to Child, a member of the Choctaw Nation. After a jury trial, held in compliance with the Indian Child Welfare Act, the jury terminated Parker's rights. Parker was present for a portion of the trial. In this appeal we do not decide the merits of that termination decision. We are concerned only with whether Parker's procedural due process rights were violated, and whether the trial court was required to comply with the provisions of ICWA found in Title 25, Section 1912 (d) and (f) of the United States Code. We answer both questions in the affirmative and remand the case for a new trial.

Facts

¶2 Child was born on June 3, 2020. Parker was unaware that Child was his, and Mother had the care and custody of Child. Parker was incarcerated in August 2020. The State first notified Parker he might be Child's father in March 2022, and in June 2022 genetic testing determined paternity. On April 1, 2022, State filed a petition alleging Child was deprived while in Mother's care, and Child was adjudicated deprived on May 31, 2022. On December 14, 2022, State moved to terminate Parker's parental rights. Because Child is a member of the Choctaw Nation, the provisions of the federal and Oklahoma ICWA statutes apply.

¶3 Trial on the motion to terminate was held on May 11, 2023. Parker, the first witness, appeared by video. He testified that at the time of the trial he was in federal prison, serving a 51-month sentence that began in August 2020, and that he expected a release date in September 2023. Parker admitted he had been incarcerated four separate times since about 2003, for various criminal offenses. He testified that he had only seen Child in person once, shortly after Child's birth, but did not at that time know Child was his. He said Mother told him at that time that he was not the father. Parker said he had never had custody, had never established a relationship with Child, and did not provide Child with support. He admitted his history of drug abuse and crime, and said that since his most recent incarceration he had been drug-free. Parker discovered he was Child's father when he took a state-ordered paternity test while in prison; Mother had told state officials she wasn't sure if he was the father. At that point, Parker began taking parenting classes in prison, as well as drug education and rehabilitation classes to help him change his outlook and behavior. He also tried to find a family member with whom Child could be placed. Parker said before that, he had no opportunity to be involved in Child's life because he didn't know he was the father. He testified he believed it was in Child's best interests for him to retain parental rights, so Child could have a relationship with him, his family, and Child's siblings.

¶4 The State called four other witnesses. Two employees of the State Department of Human Services (DHS) testified before the lunch break. The first completed her testimony, while the second had just finished her direct testimony. During the lunch break the prison disconnected Parker's video feed. He was thus not present for the second DHS witness's cross-examination, and was wholly unable to participate during the testimony of Child's foster mother and an ICWA compliance expert with the Choctaw Nation. Both those witnesses testified as to Child's current placement. The foster mother testified she had no contact with Parker. The ICWA compliance expert gave her opinion that, were Parker to have continued custody of Child, it would likely result in emotional or physical damage to Child, and that it was in Child's best interest to terminate Parker's parental rights. Parker had no opportunity to personally confront these witnesses. After testimony concluded, the jury returned a verdict to unanimously terminate Parker's parental rights, finding that he was incarcerated, continuation of his parental rights would harm Child because, beyond a reasonable doubt, it would likely result in serious emotional or physical harm to Child, and that termination was in Child's best interests.

¶5 Parker appealed. The matter was assigned to the Court of Civil Appeals, Division I. COCA considered two issues: (1) were Parker's due process rights violated when his trial continued without him; and (2) does ICWA require the State to show by clear and convincing evidence that it made active efforts to prevent the breakup of the Indian family, and to show beyond a reasonable doubt that Parker's continued custody of Child is likely to result in serious emotional or physical damage to Child, as required by 25 U.S.C. §§ 1912(d) and (f). COCA determined that (1) Parker's due process rights were violated; and (2) under the circumstances of this case, the State was not required to make either showing under ICWA. We granted certiorari.

Standard of Review

¶6 We review a claim that due process was denied in a proceeding to terminate parental rights de novo. In the Matter of A.M. & R.W., 2000 OK 8213 P.3d 484

I. Parker's due process rights were violated when his jury trial continued without him

¶7 COCA correctly found that Parker was denied procedural due process. Every parent has a fundamental liberty interest in their child's care and custody. Santosky v. Kramer, 455 U.S. 745, 753-54 (1982); In the Matter of K.H., 2021 OK 33507 P.3d 647Matter of Rich, 1979 OK 173604 P.2d 1248In the Matter of A.M., 2000 OK 82Id., 2000 OK 82

¶8 The State argues that Parker's due process rights were not violated because (a) he was represented by counsel and allowed to testify, and (b) he could have used alternative means to gain access to the proceeding. Oklahoma allows testimony to be taken by affidavit, deposition, or oral examination. 12 O.S. § 421A.M., 2000 OK 82A.M., we balanced the mother's right to confrontation with the best interests of the child, weighing her rights against the trauma the child would experience from being in mother's presence, and recognizing that mother had already had the opportunity for face-to-face confrontation with the child in a previous proceeding. Id., 2000 OK 82Id., 2000 OK 82

¶9 Parker's circumstances are very different. Parker affirmatively chose to participate with his contemporaneous presence, and that choice was thwarted midway through the proceedings by no fault of his. The record shows no possibility that, during the trial itself, Parker could make alternative arrangements for his continued participation. That is, once the proceeding began, he could not have used an alternative method of participation. And the State does not suggest otherwise; it merely argues that Parker could have submitted a deposition or video (or, presumably, affidavit) before the proceedings. That is, the State appears to suggest that incarcerated persons who wish to participate in similar proceedings must attempt to preserve their right to participate by, in advance, submitting affidavits or depositions in addition to live video participation -- just in case their video access is cut. This places an unreasonable burden on these incarcerated litigants who have, after all, not brought these lawsuits; Parker and similar litigants are defending against proceedings to remove their most fundamental parental rights. This suggestion also wholly fails to preserve the right to confront witnesses.

¶10 Parker's private interest in his parental rights is "of utmost importance." A.M., 2000 OK 82Id. However, unlike in A.M., the interests here are not equal. The record does not reflect that Child's welfare would have been at issue had the parties paused the proceedings until Parker's continued attendance was secured. And, while such a delay might have caused the State to suffer inconvenience and incur administrative and fiscal burdens, depriving Parker of his right to confrontation created a significant risk that he was erroneously deprived of his parental rights. Under the circumstances of this case, choosing to proceed with the trial after Parker's live feed was cut deprived him of due process.

II. 25 U.S.C. § 1912 requirements apply in a proceeding to terminate parental rights where Parent does not have physical or legal custody

¶11 The Indian Child Welfare Act governs custodial placement of Indian children, including termination of parental rights. It was intended to recognize and address the consequences of the separation of Indian children from their families and tribes. Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32 (1989). Recognizing both the Indian parents' and the tribe's interests in their children, Congress established as a matter of policy that, where possible, Indian children should be raised in the Indian community, and in making custody determinations courts should prioritize Indian community traditions and standards, rather than non-tribal standards which may foreclose a tribal placement. Id. at 37. To further this goal, Congress included special requirements. Before seeking termination of parental rights in an ICWA case, a party must show by clear and convincing evidence that there were active, but unsuccessful, efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d). And the court must determine beyond a reasonable doubt, considering testimony of qualified expert witnesses, "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

¶12 At trial, both parties stipulated that the Choctaw Nation ICWA compliance officer was an expert witness. She testified that Child's current placement with a Cherokee family was ICWA compliant. Her expert opinion was that, based on Parker's incarceration, as well as his past behavior in failing to correct conditions that led to Child's removal from parental custody, if Parker were to have continued custody it would likely result in emotional or physical damage to Child. She also testified that DHS, in contact with the Choctaw Nation, had spent most of Child's life engaging in active efforts to reunite her with Mother. She said that, probably due to Parker's numerous incarcerations and the criminal activity, neither the State nor the Nation had been able to contact him. The expert testified that in her opinion the State had both actively sought to prevent the breakup of the Indian family and to seek a proper ICWA placement for Child.

¶13 Based on this testimony, the trial court specifically found that active efforts were made to provide services and prevent the breakup of the Indian family, and that those services were unsuccessful. In finding that Parker's rights should be terminated the jury also specifically found beyond a reasonable doubt that continued custody by Parker was likely to result in serious emotional or physical damage to Child. On appeal, Parker claimed there was not sufficient evidence to support a finding that the State actively attempted to prevent the breakup of the Indian family.

¶14 Rather than answer that question, COCA took a detour. Relying primarily on a United States Supreme Court case, COCA determined that, if Parker never had a relationship with Child, the requirements of ICWA Sections 1912(d) and (f) would not apply. As the trial court never made a specific finding regarding the nature of Parker's relationship with Child, COCA ordered the trial court on remand to make that finding. COCA then concluded if there was no relationship the State would not have to make the necessary showings under ICWA. Parker petitioned for certiorari, arguing that COCA misapplied federal and Oklahoma law regarding ICWA. We agree.

¶15 The ICWA Section 1912 requirements are intended to respect and preserve the tribes' interest in the custody and care of its children, and the detrimental impact to a child of placement outside its culture, in addition to and independent of any parental custodial interest. Holyfield, 490 U.S. at 49-50. Oklahoma adopted the Oklahoma ICWA (OICWA) to clarify state policies and procedures used to implement the federal statutory scheme. After Holyfield, the Legislature amended the OICWA policy statement to recognize that "Indian tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated." 10 O.S. § 40.110 O.S. § 40.3In the Matter of Baby Boy L., 2004 OK 93103 P.3d 1099

¶16 This Court reinforced this policy in Baby Boy L. There, the non-Indian mother refused father's attempts to be active in the baby's life and sought a non-Indian adoption outside the reservation. Indian father objected to the adoption, and the tribe intervened, moving to dismiss the adoption and seeking ICWA compliance. The trial court applied a doctrine called the "existing Indian family exception." This doctrine, applied in a minority of states, requires that for ICWA to apply a child must be living in an Indian home, or already have a primarily Indian cultural heritage, or are otherwise somehow culturally "Indian", rather than applying the federal ICWA definitions of Indian children. This Court, interpreting the OICWA amended language, concluded that through the amendments the Legislature had explicitly repudiated the "existing Indian family" exception to ICWA, and that exception could not be applied under Oklahoma law. Baby Boy L., 2004 OK 93

¶17 Baby Boy L. remains good law. COCA here relied on a subsequent United States Supreme Court case, Adoptive Couple v. Baby Girl, 570 U.S. 637 (2013). There, the Court held that the ICWA Section 1912 provisions did not apply, and parental rights could be terminated, where the Indian parent had never had custody or assumed any responsibility for the Indian child, and there had been no "Indian family" to preserve. Baby Girl, 570 U.S. at 647-48, 651-52. Neither ICWA nor South Carolina law -- the legal basis for the Court's ruling -- included the specific language found in the Oklahoma statutes. And the Oklahoma Legislature has not amended our statutes in response to Baby Girl. This Court is compelled to give effect to the plain language of the OICWA.Baby Boy L. However, COCA here failed to consider or apply Baby Boy L.

¶18 Following the plain language of the OICWA and Baby Boy L., we conclude that the trial court correctly found the requirements of ICWA Section 1912 apply to this case. Because the case must be remanded for a new trial, we express no opinion on the substantive issue Parker raised in his appeal.

Conclusion

¶19 Parker's constitutional due process rights were violated when his trial continued without him. The case must be remanded for a new trial. The trial court shall ensure that the new trial is conducted in compliance with the provisions of ICWA and OICWA, including those in Section 1912.

CERTIORARI PREVIOUSLY GRANTED;
COURT OF CIVIL APPEALS OPINION VACATED;
TRIAL COURT REVERSED;
CASE REMANDED TO TRIAL COURT

CONCUR: Rowe, V.C.J., and Winchester, Edmondson, Combs, Gurich, Darby and Kuehn, JJ.

CONCUR IN PART and DISSENT IN PART: Kane, C.J.

Kane, C.J., Concurring in Part and Dissenting in Part:
" I believe that the Court of Civil Appeals was correct on all counts."

FOOTNOTES

Baby Boy L., while the other neglects to cite it at all. And neither considers the specific OICWA language which controls our analysis.